1 Kevin M. Cassidy (*pro hac vice*)
Oregon Bar No. 025296
Earthrise Law Center
2 Lewis & Clark Law School
P.O. Box 445
3 Norwell, MA 02061
(781) 659-1696
4 cassidy@lclark.edu

5 Adam Keats (*pro hac vice*)
California Bar No. 191157
6 CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Suite 600
7 San Francisco, CA 94104
415-436-9682 x304
8 akeats@biologicaldiversity.org

9
Attorneys for Plaintiffs
10
IN THE UNITED STATES DISTRICT COURT
11
FOR THE DISTRICT OF ARIZONA
12
PRESCOTT DIVISION
13

| | |
|---|---|
| 14 CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; and 15 GRAND CANYON WILDLANDS COUNCIL, 16 | Case No: 3:12-cv-08176-SMM |
| Plaintiffs, 17 vs. | **RESPONSE IN OPPOSITION TO NRA'S MOTION TO INTERVENE** |
| 18 UNITED STATES FOREST SERVICE, 19 Defendant. 20 | |

21
22      COME NOW Plaintiffs Center for Biological Diversity, Sierra Club and Grand

23 Canyon Wildlands Council (collectively "Plaintiffs"), and file this Response in

24 Opposition to the National Rifle Association's and Safari Club International's[1] Motion to

25 Intervene (Doc. No. 28) and supporting documents.  Plaintiffs oppose the NRA's motion
26

27 _____

28 [1] The National Rifle Association and Safari Club International are referred to collectively in
this Response as the "NRA."

because it has not satisfied all of the requirements for intervention as of right.

Specifically, the NRA has not shown that the United States Forest Service ("Defendant"

or "Forest Service") will not adequately represent its interests in the liability phase of the

litigation.  Additionally, because one of the NRA's main objectives—challenging the

scientific bases for the widely-accepted and well-established threat spent lead

ammunition poses to California condors—will unduly delay the proceedings, permissive

intervention in the liability phase should not be allowed.  Accordingly, the Court should

limit the NRA's participation to the remedy phase of the litigation.

## I.     Background

In this case brought under the citizen suit provision of the Resource Conservation

and Recovery Act ("RCRA"), Plaintiffs seek declaratory relief and to permanently enjoin

the Forest Service from contributing to an imminent and substantial endangerment to

human health or the environment on the Kaibab National Forest.  The endangerment is

caused by the disposal of spent lead ammunition on national forest land that is later

ingested by wildlife there.  The NRA seeks to intervene in this action for the stated

purpose of preserving its members' rights to continue to use lead ammunition in the

Kaibab National Forest—in other words, to preserve the regulatory status quo.

The risk of poisoning and mortality posed to wildlife by spent lead ammunition is

well established.[2]  Wildlife species are exposed to spent lead ammunition when they

consume mammals that have been shot but not retrieved or when they consume the

---

[2] *See* National Park Service ("NPS") website,
http://www.nps.gov/pinn/naturescience/leadinfo.htm (accessed Jan. 4, 2013) ("More than
500 scientific studies published since 1898 have documented that worldwide, 134 species
of wildlife are negatively affected by lead ammunition.").

remains of field-dressed animals (also known as "gut piles") that have been killed with

lead ammunition.  Complaint, ¶¶ 28-29.  Non-lead ammunition—which has been

available for years and is already is being used by NRA members (NRA Mot. at 9, n.8)—

would prevent the needless deaths of countless wildlife from lead poisoning.

In northern Arizona, the regular lead poisonings and deaths of California condors,

the largest flying birds in North America, best illustrate the adverse effects on wildlife of

spent lead ammunition in the environment.  After dwindling to the brink of extinction in

the early 1980s, California condors have rebounded due to a captive breeding program

administered primarily by U.S. Fish and Wildlife Service ("FWS"). Captive-bred condors

have been reintroduced to areas of their historic range, including the Grand Canyon

ecoregion, which includes the Kaibab National Forest.  As part of the reintroduction

effort, FWS created the Southwest Condor Recovery Team ("SCRT") to study and

monitor condors' health and progress toward self-sustainability.[3] The SCRT conducts

comprehensive reviews of the program every five years, the most recent of which was

released in May 2012 ("2012 Review").[4] *See* Doc. 21, Att. B.  The 2007 and 2012

Reviews focused on the issue of lead poisoning from spent ammunition, which is the

undisputed primary cause of condor mortality in the southwest population.

The SCRT identified lead poisoning from ammunition sources as a particular

threat to condors more than 10 years ago.  2002 Review at 22 ("Considering the number

---

[3] The SCRT is comprised of representatives from FWS, the Forest Service, the Bureau of Land Management, the National Park Service, the Arizona Game and Fish Department, the Utah Division of Wildlife Resources, and The Peregrine Fund.
[4] The first Five-Year Review was published on February 14, 2002 ("2002 Review") (attached as Exhibit 1); the second Five-Year Review was published in April 2007 ("2007 Review") (attached as Exhibit 2).

of game animals harvested each year (and associated gut piles left behind) within the

current foraging range of the condor, and the number of animals that likely go

unrecovered by hunters, there is a *substantial and ongoing risk* of lead poisoning in

condors.") (emphasis added).  In subsequent reviews, the SCRT has confirmed the

existence of this "substantial and ongoing risk" posed by spent lead ammunition in the

environment.  *See* 2007 Review at 18 ("In summary, shotgun pellets and rifle bullet

fragments in animal carcasses have been the primary source of lead contamination to

condors in Arizona."); 2012 Review (Doc. 21, Att. B) at 8.

Since their reintroduction to northern Arizona, condors have foraged on the Kaibab

Plateau in the Kaibab National Forest.  2002 Review at 12.  The Kaibab National Forest is

a popular hunting area (NRA Mot. at 6), especially for big game, which is a preferred

food source for condors.  2002 Review at 14.  The 2007 and 2012 Reviews documented

increases in blood lead levels in condors during and after hunting seasons.  *See, e.g.*, 2012

Review at 10 (noting "abrupt increase of [condor] blood lead levels has corresponded

with increased [condor] use of deer hunting areas on the Kaibab Plateau and southern

Utah since 2002").  Although the majority of the evidence involves condors, other species

live in the Kaibab National Forest that also are known to have been poisoned by exposure

to lead ammunition, including golden and bald eagles.  Complaint, ¶ 27.

II.   **The NRA Has Not Met the Requirements for Intervention as of Right**

Applicants to intervene as of right must demonstrate that four requirements are

met:

(1) the motion must be timely[5]; (2) the applicant must claim a "significantly

---

[5] Plaintiffs do not contest the NRA's motion on timeliness grounds.

4

protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*California ex rel. Lockyer*, 450 F.3d 436, 440 (9th Cir. 2006). "The party seeking to intervene bears the burden of showing that *all* the requirements for intervention have been met." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) (emphasis in original). Courts "are guided primarily by practical and equitable considerations" and "generally interpret [intervention] requirements broadly in favor of intervention." *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998).

Nonetheless, courts retain broad discretion in determining when and how applicants for intervention may participate in the litigation. *See* Advisory Committee Notes on Fed. R. Civ. P. 24 (intervention "may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings"); *see also Donnelly*, 159 F.3d at 409-10 (examining appropriateness of intervention separately for liability and remedial phases of case). Accordingly, this Court should analyze the intervention factors in relation to the phase of the case purportedly implicated by the NRA's articulated interests.[6] *See, e.g., id*.

> ### A.   The NRA Has Failed to Show That Its Interests Will Be Inadequately Represented by the Forest Service During the Liability Phase of the Case

An applicant for intervention bears the burden of demonstrating existing parties

---

[6] To the extent the NRA argues that *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983), prohibits limiting intervention to the remedial phase only, the Ninth Circuit explicitly foreclosed that argument in a later-decided case. *See Donnelly*, 159 F.3d at 410, n.4.

will not adequately represent its interests.  A presumption of adequate representation

exists when "an applicant for intervention and an existing party have the same *ultimate*

objective."  *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996)

(emphasis added).  Because the NRA and the Forest Service share the same "ultimate"

objective—regulatory status quo for the Kaibab National Forest—this Court should

presume the Forest Service adequately represents the NRA's interests at the liability

phase.  In light of this presumption, the NRA must make a "compelling showing" to

demonstrate inadequate representation.  *Id*.  It has not done so.

The NRA argues that no presumption should apply because the NRA and the

Forest Service "have different objectives."  NRA Mot. at 13. But this is merely an

attempt to parse the language of its "objectives" to manufacture a difference with the

Forest Service.  The Forest Service's "ultimate" objective of preserving the regulatory

status quo for the Kaibab National Forest means, in the NRA's words, "avoiding a

finding of liability against it under RCRA and preserving its ability to continue to

regulate uses of its lands without potential RCRA liability."  NRA Mot. at 13; *see also*

Def. Mot. to Dismiss (Doc. 46) at 12-16.  For the NRA, regulatory status quo means

"preserving their members' ability to continue to use lead ammunition" for hunting in the

Kaibab National Forest.  *Id*.  The Forest Service's success in achieving its "ultimate"

objective necessarily achieves the NRA's "ultimate" objective.  "Where parties share the

same ultimate objective, differences in litigation strategy do not normally justify

intervention."  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003).

In light of the presumed adequacy of representation, the NRA has not made a

compelling showing that the representation by the Forest Service at the liability phase is

inadequate.[7] Even beyond the applicability of a presumption, the NRA has not made the "minimal" showing necessary to meet its burden of establishing inadequacy of representation at the liability phase.  The Ninth Circuit considers three factors: "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Arakaki*, 324 F.3d at 1086. None of the three factors weighs in favor of NRA intervention at the liability phase.

### 1.    The Only Argument NRA Has Identified that the Forest Service is Unlikely to Make on Liability Is Meritless

The NRA attempts to identify a facet of the litigation for which its objectives diverge with the Defendant's at the liability stage.  Specifically, the NRA articulates its additional objectives as:

> obtaining a ruling indicating that the normal use of lead ammunition in the Kaibab NF does not create: (1) an "imminent and substantial endangerment to health or the environment" under RCRA, and (2) a legal basis to limit lead ammunition use because of alleged health concerns related to members of the experimental population of condors released in Arizona.

NRA Mot. at 13.  The NRA claims that the Forest Service's representation of its interests will be inadequate because "the Service has apparently adopted CBD Plaintiffs' theory

---

[7] The NRA also makes a passing reference to the language in 42 U.S.C. § 6972(b)(2)(E), suggesting that it supplants any otherwise applicable presumption of adequacy of representation.  The NRA cites to no authority, however, nor are Plaintiffs aware of any, that suggests this provision renders inapplicable the body of case law discussed herein. Moreover, the NRA's reading of the statute is strained, to say the least.  The provision by its terms applies only to the EPA Administrator and the State, neither of which is a party to this case.  Indeed, the legislative history of this provision makes clear that Congress included it to ensure members of the public who live near an endangerment would be able to intervene in a state or EPA-initiated action.  *See* S. Rep. No. 98-284, at 15 (1983). Obviously, that is not the posture of this case.

1    that hunter-shot lead ammunition is the main threat to condor survival."[8] *Id*. at 15.   The

2    NRA then knocks down its straw man objectives, claiming, "it is doubtful the Service

3    will make NRA and SCI's arguments that run contrary to that theory."[9] *Id*.

4
          While the NRA likely correctly assumes that "the Service will not challenge
5
     [Plaintiffs'] proffered evidence and basic underlying theory that hunter-shot lead
6
7    projectiles pose a particular threat to condors" and other wildlife (NRA Mot. at 14), there

8    is good reason for this.  The government has consistently taken that position for more

9    than a decade, and overwhelming evidence demonstrates the imminent risk spent lead

10
     ammunition poses to wildlife, and specifically to condors in the Kaibab National Forest
11
12   since their reintroduction there 15 years ago.  The scientific evidence of endangerment,

13   including years of data from tracking and measuring blood lead levels of condors in

14   Arizona, is more than sufficient to meet the relatively low threshold to show the disposal
15
     of spent lead ammunition in the Kaibab National Forest "may present" an imminent and
16
17   substantial endangerment under RCRA § 6972(a)(1)(B).

18        Accordingly, the fact that the Forest Service likely will not challenge Plaintiffs'
19
     proffered endangerment evidence—most of which has been generated by the federal
20
21   government itself in support of the condor reintroduction program—is not a factor

22
     ---
23   [8] This statement is misleading insofar as the federal government (and the State of Arizona
     for that matter) has long believed that exposure to spent lead ammunition in the
24   environment is the main threat to condor survival.  *See infra*, at 11-13. Plaintiffs have
     adopted the federal government's theory in that regard—not the other way around.
25   [9] In *Southwest Center for Biological Diversity v. Berg*, the Ninth Circuit overturned a
     district court denial of intervention stating that it was not the applicant's burden "to
26   anticipate specific differences in trial strategy."  *Sw. Ctr. for Bio. Div. v. Berg*, 268 F.3d
     810, 824 (9th Cir. 2001). Here, however, the NRA *has* identified the one different
27   argument it intends to make that the Defendant likely will not, but, as explained below, that
     argument is without merit.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

weighing *in favor* of NRA intervention.  To the contrary, it is a factor weighing *against*

NRA intervention in the liability phase of the case.  There is no requirement—nor should

there be—that present parties to the litigation "will undoubtedly make all the interveners'

arguments," no matter how meritless.  Similarly, Defendant is certainly *capable* of

making the argument the NRA suggests, but the fact that it may be *unwilling* to do so

speaks more to weakness of the argument than it does to the adequacy of representation

at the liability phase.  Rule 24 analysis "is guided primarily by *practical and equitable*

*considerations*."  *Donnelly*, 159 F.3d at 409 (emphasis added). The overriding practical

consideration in this instance is the time and resources the Court and the parties will

spend litigating an issue that no one—not the Forest Service, not the state of Arizona, not

the SCRT—*other than the NRA* disputes.

     Accordingly, in order to achieve its "objectives," the NRA must overcome, as

described in detail below, a legal endangerment standard that Congress intended to err on

the side of protecting health and the environment, as well as overwhelming and objective

scientific evidence.  Because the NRA's likelihood of success in prevailing in this regard

is extremely low, allowing it to intervene in the liability phase cuts against the "practical

considerations" that guide the intervention analysis.

         **a.**       **Plaintiffs Must Show Only that the Waste at Issue *May Present***
                    **an Imminent and Substantial Endangerment**

     While the NRA intends to argue "that the best scientific evidence available does

not sufficiently establish a nexus between condor illness and hunters' use of lead

ammunition" (NRA Mot. at 14), the NRA's motion fails to discuss the well-established

legal standard for the "imminent and substantial endangerment" element of Plaintiffs'

1    RCRA § 6972(a)(1)(B) claim—a critical factor in the overall evaluation of whether

2    intervention is appropriate.  The Ninth Circuit—and every other circuit that has analyzed

3    this element of RCRA § 6972(a)(1)(B) claims—has concluded, "a finding that an activity

4    may present an imminent and substantial harm does not require actual harm."  *Price v.*

5    *U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (citing cases); *see also Dague v. City of*

6    *Burlington*, 935 F.2d 1343, 1355(2d Cir. 1991) (finding Congress' use of the word

7    "may" intended "to confer upon the courts the authority to grant affirmative equitable

8    relief to the extent necessary to eliminate *any risk* posed by toxic wastes.") (emphasis in

9
10   original), *rev'd in part on other grounds*, 505 U.S. 557 (1992).

11       When courts have found that plaintiffs have not met their burden to show that the

12   waste at issue "may present" an imminent and substantial endangerment, unlike the facts

13   Plaintiffs allege here, those plaintiffs showed absolutely no nexus or pathway connecting

14
15   the waste to the potential exposure.  For example, the Ninth Circuit in *Price* found no

16   endangerment existed where a concrete foundation covered any possible contamination

17   and any cracks in the concrete could be repaired without disturbing the foundation and

18   underlying soil.  *Price*, 39 F.3d at 1020-21. In other words, there was no possible

19
20   exposure pathway and no "necessity for action."  *Id.* at 1019.

21       The NRA does not even suggest it can establish that there is no potential exposure

22   pathway between spent lead ammunition in the environment and harm to wildlife.  In

23
24   fact, its motion implicitly acknowledges this nexus exists when it states the NRA "has

25   found evidence that suggests that lead poisoning may not be *the leading cause of death*

26   of condors released in Arizona."  NRA Mot. at 15 (emphasis added).  Even if the NRA

27   could prove (and it cannot) that lead poisoning is not be the "leading cause of death of

28

10

1    condors," that would not successfully rebut Plaintiffs' evidence that spent lead

2    ammunition "may present" an imminent and substantial endangerment to condors and

3    other wildlife.

4
           **b.      Overwhelming Evidence Will Show That Spent Lead**
5                   **Ammunition *May Present* an Imminent and Substantial**
                   **Endangerment to Condors and Other Wildlife in the**
6                   **Kaibab National Forest**

7
           When viewed in the context of RCRA's endangerment standard, it is clear that the
8
     best available evidence will be more than sufficient to satisfy the standard. The scientific
9
10   evidence catalogued below and that the Plaintiffs would present if necessary was

11   generated independently as part of the condor recovery program, not on behalf of the

12   Plaintiffs' position in this litigation.  Moreover, Plaintiffs are unaware of any peer-
13
     reviewed scientific articles or opinions disputing the existence of the spent lead
14
15   ammunition threat to condors in the Kaibab National Forest.

16         As discussed above, the 2012 Review by the SCRT concluded, "the most
17
     significant issue raised in the second program review [in 2007], exposure to lead
18
19   contamination, continues to affect both individual birds and the southwest population."

20   2012 Review at 4.  The 2012 Review confirmed the conclusion of the 2007 Review that

21   "[l]ead poisoning has been by far the leading cause of condor fatalities since
22
     reintroduction in 1996." *Id*. at 15.  In addition, 63% of wild condors tested in 2011 were
23
24   found to have blood lead levels indicative of lead exposure. *Id*. at 19.  The SCRT

25   determined that 18% of the condors tested in 2011 had toxic blood lead levels.  *Id*.  The

26   recognized primary sources of lead contamination to condors in Arizona are "shotgun
27
     pellets and rifle bullet fragments in animal carcasses."  *Id*. at 18.
28

Further, SCRT data linked blood lead levels in condors to hunting on the Kaibab Plateau. *Id*.; *see also* 2012 Report at 13 ("Like the previous five years of the condor release program in Arizona, lead poisoning cases occur predominantly in the fall and winter months and are associated with the big-game hunting seasons.").

Not surprisingly, the SCRT's conclusion that lead poisoning from spent ammunition is the leading threat to condors is widely shared among all agencies of the federal government. The U.S. Department of the Interior recognizes the fact that lead poisoning poses a serious threat to condors:

> *scientific studies have reached a consensus*: lead poisoning is the biggest threat facing the successful recovery of the California condor. . . . [L]ead poisoning through ingestion of spent lead bullets and shell shot has been demonstrated as being a serious factor for many other wildlife species too, including our national symbol the bald eagle . . . golden eagles, hawks, ravens, turkey vultures, and grizzly bears.[10]

The Bureau of Land Management ("BLM") warns hunters "[w]hen condors, eagles, vultures, and ravens feed on carrion which contains lead bullet fragments, their digestive tract [sic] stops functioning and the birds die a slow agonizing death."[11]

In 2010, a Blue Ribbon Panel of experts assembled by the American Ornithologists' Union to conduct a comprehensive review of the California condor reintroduction program concluded:

> Although the significance and source of lead exposure in reintroduced condors were debated just a few years ago, *there is now widespread consensus and considerable evidence* that poisoning from ingestion of lead ammunition fragments in carcasses currently precludes the establishment of

---

[10] NPS website, http://www.nps.gov/pinn/naturescience/leadinfo.htm (accessed Jan. 4, 2013) (emphasis added).

[11] BLM Website, http://www.blm.gov/ca/st/en/fo/bakersfield/Programs/carrizo/hunting.html (accessed Jan. 4, 2013).

viable populations in the wild.[12]

Thus, in the past three years, significant new scientific data has been added to the already

robust collection of evidence demonstrating the risk to wildlife posed by spent lead

ammunition in the environment.[13]

The State of Arizona concurs that lead toxicity is the leading cause of mortality for

condors in Arizona:  "Lead toxicity has been identified as the leading cause of death in

condors in the Arizona reintroduction program. . . . Biologists have documented over 300

instances of lead exposure in condors since testing began in 1999, with 45 to 95 percent

of the condor population testing positive for lead exposure each year."[14]  Further, the

source of lead exposure is clear to the state: spent lead ammunition from hunting. *Id*.

**2.    The NRA Offers No Elements Necessary to the Proceedings**

The NRA offers little by way of explanation of what necessary elements it would

add to the liability phase.  The NRA claims to have "compiled and analyzed relevant

scientific data and related material to effectively define the scientific deficiencies that

---

[12] Walters, J. et al., Status of the California Condor (*Gymnogyps Californianus*) and Recovery Efforts to Achieve Its Recovery, in The Auk 127(4):969-1001 (2010), at 974 ("Blue Ribbon Panel Study") (internal citations omitted) (attached as Exhibit 3).
[13] For this reason, the NRA's intervention in the prior case in Arizona against the BLM to contest the same science is distinguishable.  In that case, the NRA sought intervention "to argue that the administrative record and the relevant scientific data do not support CBD's assertion regarding the prevalence of lead-related condor mortalities." *See Center for Biological Diversity v. Bureau of Land Mgmt.*, Case No. 3:09-cv-08011-PCT-PGR (D. Ariz.), Doc. 58, at 8-9 (Jan. 30, 2010).  Since that opinion issued on January 30, 2010, in addition to substantial evidence contained in the 2012 SCRT report, the independent Blue Ribbon Panel concluded "[a]lternative views about the threat posed by lead and sources of lead exposure, which were plausible only a few years ago, are no longer credible."  Blue Ribbon Panel Study at 974. The other two cases cited by the NRA in which it sought and obtained permission to intervene (NRA Mot. at 3, n.2) involve issues and potential regulatory changes that are much broader than the discrete endangerment alleged here.
[14] *See* http://www.azgfd.gov/w_c/california_condor_lead.shtml (accessed Jan. 4, 2013).

underlay the contested conclusion that condors are dying from the ingestion of hunter-shot lead." Of course, as described above, Plaintiffs' RCRA claim does not require actual harm (although all of the evidence supports actual harm is occurring). So even assuming such material exists and is being accurately portrayed by the NRA as contesting the conclusion that "*condors are dying*"—which Plaintiffs do not concede—that would not undermine Plaintiffs' claim that spent lead ammunition in the environment "may present" an imminent and substantial endangerment.

Finally, the NRA's contention that it is "unaware of the Service having this particular expertise" (NRA Mot. at 16) is absurd. As shown above, the federal government, due to its work in reintroducing condors to northern Arizona and oversight of and participation in the ongoing activities of the SCRT since 1996, has acquired significant and "particular expertise" regarding the threats facing condors in Arizona.

> **B.      The NRA's Articulated Interests and Purported Impairment Thereof Are Overstated, But in Any Event Are Protectable at the Remedy Phase of Litigation**

The NRA asserts it has interests in (1) their members' continued ability to hunt with lead ammunition in the Kaibab National Forest; (2) their organizations' ability to carry out their missions "to preserve the tradition of hunting, and to protect it from unreasonable and unnecessary restrictions"; and (3) protecting and preserving the rights of hunters to continue to enjoy areas that have traditionally been open to hunting." NRA Mot. at 9-10. All of these interests, and those discussed in the substance of the declarations filed in support of the NRA's motion, are implicated, if at all, during the remedy phase of the litigation.

As an initial matter, any restrictions on hunting with lead ammunition on the

14

Kaibab National Forest in order to prevent lead poisonings and deaths of condors and other wildlife would be neither "unreasonable" nor "unnecessary."  Similar restrictions on the use of lead ammunition have become commonplace around the country both on the state and federal level.  *See, e.g.*, California's Ridley-Tree Condor Preservation Act, AB 821 (2007) (prohibiting the use of lead ammunition in condor range); 75 Fed. Reg. 75153-01 (December 2, 2010) (FWS's final rule requiring that non-lead shot or bullets be used in most cases when depredating certain bird species).

The trend toward limiting or prohibiting the use of lead ammunition when and where its use poses a threat to wildlife is clear.  And, as discussed in detail above, the threat posed to condors by the use of lead ammunition in the Kaibab National Forest is beyond dispute.  The best available science has concluded it is *necessary* to address the prevalence of spent lead ammunition in the environment in order to prevent future condor poisonings and deaths due to lead toxicosis.

Additionally, if Plaintiffs prevail on liability, and if the use of lead ammunition for hunting is prohibited or otherwise restricted in the Kaibab National Forest, such a ruling absolutely would not prevent NRA members from continuing to hunt there.  NRA members would enjoy the same access to the Kaibab National Forest that existed prior to any potential lead ammunition restrictions.  Hunters would be able to hunt, *inter alia*, in the same areas, for the same species and numbers of game, and at the same times of year. And although the NRA claims that Plaintiffs seek a remedy that "conflicts with federal law intended to protect hunting" (NRA Mot. at 4), the law it cites—50 C.F.R. § 17.84(j)(2)(i)—does not say what the NRA says it does.  That regulation exempts from the general prohibition of taking California condors in the experimental population area,

the "unavoidabl[e] and unintentional[] take" of condors so long as such take is "non-negligent and incidental to a lawful activity, such as hunting."  50 C.F.R. § 17.84(j)(2)(i).

Accordingly, to the extent this regulation applies at all to this RCRA case, rather than protecting hunting, it *prohibits* hunting that results in *avoidable* harm to condors.  The NRA's admission that its members already hunt with non-lead ammunition establishes that the harm to condors from exposure to spent lead ammunition is easily avoidable.

To the extent that some NRA members will be inconvenienced by having to switch to non-lead ammunition to continue to hunt in the Kaibab National Forest, the NRA can adequately represent those interests in the remedy phase of the litigation.  The NRA may present evidence supporting, for example, its contention that "ammunition regulations excluding the use of lead ammunition would *preclude* the hunting of [small game and turkey] in the Kaibab NF by hunters who cannot afford or locate non-lead ammunition."  NRA Mot. at 12 (emphasis added).  Plaintiffs would be prepared at that point to present counter evidence.[15]  At the remedy stage, therefore, this Court can weigh the purported inconvenience of some NRA members' having to switch to non-lead ammunition to hunt in a discrete geographic area in northern Arizona against the efficiency and effectiveness of imposing such restrictions in order to abate the endangerment to wildlife caused by the continued use of lead ammunition.

---

[15] *See, e.g.*,
http://www.azgfd.net/hunting/small-game-hunting/attention-varmint-and-small-game-hunters-new-non-lead-ammunition-available-this-year/2009/03/18/
(accessed Jan. 4, 2013) (blog post from Arizona's Department of Game and Fish's website from nearly four years ago describing increased availability of varmint and small game non-lead ammunition).

**III.    Permissive Intervention is Unwarranted and Should Be Denied**

The NRA's request for permissive intervention should be denied because its participation in the liability phase of the case will "unduly delay [and] prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).  As discussed above, the NRA has not shown inadequate representation in the liability phase on the part of the Forest Service for its ultimate objective, and the NRA's intervention to pursue its other objectives will result in needless delay.  *See Tripp v. Executive Office of the President*, 194 F.R.D. 344, 348 (D.D.C. 2000) (denial of permissive intervention justified by same considerations justifying denial of intervention of right, and because permissive intervention would unreasonably frustrate the case).  In cases seeking to enforce environmental laws in the public interest, delays due to intervention are especially prejudicial to parties and the public because they can stall the resolution of important environmental issues. *See Cronin v. Browner*, 898 F. Supp. 1052, 1063 (S.D.N.Y. 1995).

**IV.    Conclusion**

For the foregoing reasons, if the Court is inclined to grant the NRA's motion to intervene, Plaintiffs respectfully request the Court limit the NRA's participation to the remedy phase of this litigation.

Respectfully submitted,

Dated:  January 4, 2013          */s/ Kevin Cassidy*
                                  Kevin M. Cassidy

17

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing, which will send notification of such filing to the following:

**Dustin Maghamfar**, United States Department of Justice, Attorney for Defendant United States Forest Service.

**James Odenkirk**, Attorney for the State of Arizona.

**Adam Keats**, Attorney for Plaintiffs.

**Anna Margo Seidman, Carl Dawson Michel, Douglas Scott Burdin, and Scott M. Franklin**, Attorneys for Proposed Interveners.

/s/ *Kevin Cassidy*

18