1   Kevin M. Cassidy (*pro hac vice*)
    Oregon Bar No. 025296
2   Earthrise Law Center
    Lewis & Clark Law School
    P.O. Box 445
3   Norwell, MA 02061
    (781) 659-1696
4   cassidy@lclark.edu

5   Allison LaPlante (*pro hac vice*)
    Oregon Bar No. 023614
    Earthrise Law Center
6   Lewis & Clark Law School
    10015 S.W. Terwilliger Blvd.
    Portland, OR 97211
7   (503) 768-6894
    laplante@lclark.edu

8   Attorneys for Plaintiffs

9            IN THE UNITED STATES DISTRICT COURT

10            FOR THE DISTRICT OF ARIZONA

               PRESCOTT DIVISION
11

12  CENTER FOR BIOLOGICAL
    DIVERSITY; SIERRA CLUB; and          Case No: 3:12-cv-08176-SMM
    GRAND CANYON WILDLANDS
13  COUNCIL,
                                         **RESPONSE IN OPPOSITION TO**
14                Plaintiffs,            **NATIONAL SHOOTING SPORTS**
          vs.                            **FOUNDATION'S MOTION FOR**
                                         **LEAVE TO INTERVENE**
15  UNITED STATES FOREST SERVICE,

16                Defendant.

17

18        COME NOW Plaintiffs Center for Biological Diversity, Sierra Club, and Grand

19  Canyon Wildlands Council (collectively "Plaintiffs"), and file this Response in

20  Opposition to National Shooting Sports Foundation, Inc.'s ("NSSF") Motion for Leave to

21  Intervene (Doc. 90, hereinafter "NSSF Mot.") and Declaration of Lawrence Keane (Doc

22  91, hereinafter "Keane Dec."). NSSF claims that any relief granted by this Court to abate

23  an imminent and substantial endangerment under the Resource Conservation and

24                                                                                    1

Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), known to be occurring in one national forest, would create "uncertainty in the marketplace" that would "cascade through the [ammunition] supply chain" and cripple the entire ammunition manufacturing industry. *See* NSSF Mot. at 10–11; Keane Dec. ¶¶ 9–11. For the reasons Plaintiffs articulate below, this Court should reject NSSF's unsupported "sky is falling" speculation. Additionally, NSSF incorrectly contends that Plaintiffs' publicly stated missions and institutional goals are relevant to whether NSSF meets the elements for intervention under Federal Rule of Civil Procedure 24. *See* NSSF Mot. at 9–10. NSSF's motion fails to satisfy the requirements for intervention as of right because it has not shown that disposition of this action may, as a practical matter, impair its ability to protect a significantly protectable interest, or that the United States Forest Service ("Defendant" or "Forest Service") will not adequately represent its interests. Likewise, NSSF fails to satisfy the requirements for permissive intervention. Accordingly, the Court should deny NSSF's motion for leave to intervene, or, alternatively, limit NSSF's participation to the remedy phase of the litigation.

## I.      NSSF Has Not Met the Requirements for Intervention as of Right

Applicants to intervene as of right must meet four requirements:

> (1) the motion must be timely;[1] (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006). The

---

[1] Plaintiffs do not contest NSSF's motion on timeliness grounds.

1   Ninth Circuit has further made clear that "[t]he party seeking to intervene bears

2   the burden of showing that *all* the requirements for intervention have been met."

3   *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). When

4   deciding motions to intervene, courts "are guided primarily by practical and

5   equitable considerations" and "generally interpret [intervention] requirements

6   broadly in favor of intervention." *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th

7   Cir. 1998). Nonetheless, courts retain broad discretion in determining when and

8   how applicants for intervention may participate in litigation. *See* Fed. R. Civ. P. 24

9   advisory committee's note (1966) (intervention "may be subject to appropriate

10   conditions or restrictions responsive among other things to the requirements of

11   efficient conduct of the proceedings").

12       **A.**    **NSSF Fails to Identify a "Significantly Protectable" Interest that Will Be Impaired by the Disposition of this Action**

13   An intervention applicant must possess "a significantly protectable interest

14   relating to the property or transaction that is the subject of the action," and be so situated

15   "that the disposition of the action may as a practical matter impair or impede its ability to

16   protect that interest." *Lockyer*, 450 F.3d at 440. Not only must the interest be a

17   significantly protectable one, it must be "direct [and] non-contingent." *Dilks v. Aloha*

18   *Airlines*, 642 F.2d 1155, 1556–57 (9th Cir. 1981). A potential intervener has a

19   significantly protectable interest if it asserts an interest that is protected under some law,

20   and has a relationship to the plaintiff's claims. *Donnelly*, 159 F.3d at 409. In attempting

21   to articulate a significant protectable interest and impairment thereof, NSSF

22   mischaracterizes Plaintiffs' allegations, exaggerates the potential effects of the relief

3

1  Plaintiffs' seek, and misapplies the law of intervention.

2  **1.  NSSF Mischaracterizes the Subject of this Action**

3  As an initial matter, Plaintiffs do not, as NSSF claims, "assert that the use of

4  traditional lead ammunition for hunting must be regulated as the disposal of a hazardous

5  waste under [RCRA]." NSSF Mot. at 3. As the Complaint makes clear, Plaintiffs claim

6  that the Forest Service has contributed and is contributing to the disposal of solid waste

7  on the Kaibab National Forest ("KNF") that may present an imminent and substantial

8  endangerment to health or the environment. Complaint, ¶ 45. Thus, Plaintiffs' claim

9  seeks to address the *endangerment* that disposal of spent lead ammunition presents *on the*

10  *KNF*—only one out of 154 national forests[2] in the United States—not to regulate lead

11  ammunition as hazardous waste *per se*. The endangerment provision of RCRA is distinct

12  and independent from RCRA's regulatory scheme. *See United States v. Waste Indus.*, 734

13  F.2d 159, 164 (4th Cir. 1984) (interpreting RCRA Section 7003[3] and concluding that

14  "unlike the provisions of [RCRA's] subtitle C, [Section 7003] does not regulate conduct

15  but regulates and mitigates endangerments"); *Conn. Coastal Fishermen's Ass'n v.*

16  *Remington Arms Co.*, 989 F.2d 1305, 1314–15 (2d Cir. 1993) (recognizing "the special

17  nature of the imminent hazard lawsuit" and contrasting the difference between citizen

18  suits under RCRA Section 7002(a)(1)(A) for regulatory violations and 7002(a)(1)(B) for

19  endangerment claims).

20  [2] *See* USDA Forest Service, Land Areas of the National Forest System as of September 30, 2015 (Nov. 2015), at 4,

21  http://www.fs.fed.us/land/staff/lar/LAR2015/FY2015%20LAR%20Book.pdf.
[3] RCRA Section 7003 sets out EPA's imminent hazard enforcement authority. *See* 42

22  U.S.C. § 6973. RCRA Section 7002(a)(1)(B) uses the same standard of liability as Section 7003, and thus is "similarly interpreted." *Cox v. City of Dallas*, 256 F.3d 281,

23  294 n.22 (5th Cir. 2001).

24

4

1    NSSF concocts this straw man argument in an attempt to strengthen its purported

2   interests in this case. By conveniently omitting discussion of the critical element of any

3   RCRA endangerment claim—the endangerment itself—NSSF attempts to artificially

4   broaden the potential effects of Plaintiffs' requested remedy in this case. *See* NSSF Mot.

5   at 3, 4, 10 (describing Plaintiffs' claim but omitting mention of the imminent and

6   substantial endangerment element); Keane Dec ¶ 9 (same). As this mischaracterization

7   permeates and underlies NSSF's entire argument about the impairment of its interests in

8   this case, the Court can reject NSSF's requested intervention on this basis alone.

9    Furthermore, even though this case does not seek to regulate spent lead

10   ammunition as the disposal of hazardous waste under RCRA, where the disposal of such

11   ammunition poses an imminent and substantial endangerment to health or the

12   environment, it is *already subject to* RCRA. *See, e.g.*, *Remington Arms Co.*, 989 F.2d at

13   1317 (holding that lead ammunition discarded on a shooting club's property constituted

14   hazardous waste for purposes of RCRA's endangerment provision); *Benjamin v. Douglas*

15   *Ridge Rifle Club*, 673 F. Supp.2d 1210, 1222 (D. Or. 2009) ("[A] RCRA permit [is not]

16   required to operate a shooting range but spent lead shot (or bullets) *left in the*

17   *environment*, is subject to the broader [statutory] definition of solid waste") (emphasis in

18   original) (internal quotation marks omitted). While this case may present certain novel

19   issues, the issue of whether RCRA covers spent lead ammunition when its disposal may

20   present an imminent and substantial endangerment is not one of them. RCRA has, for

21   decades, covered the disposal of spent lead ammunition that may present an imminent

22   and substantial endangerment. Thus, NSSF's speculation about possible new and

23

24                                                                                                              5

1    burdensome applications of the relief Plaintiffs seek in this case is a red herring.

2         NSSF also attempts to distract from the subject matter of this lawsuit by citing to

3    statements made by Plaintiffs about their organizational goals and missions. *See* NSSF

4    Mot. at 9–10. Plaintiffs' overarching missions of environmental protection and political

5    stances regarding lead ammunition are irrelevant to NSSF's right to intervene in a

6    particular lawsuit to prevent an endangerment in one national forest. To consider

7    Plaintiffs' statements about their position toward lead when ruling on this motion would

8    be to extend Rule 24's requirements about an interest "relating to the property or

9    transaction that is the subject of the action" to a mere abstract interest in the underlying

10   policies and goals of the litigating parties. Fed. R. Civ. P. 24(a)(2). Even if it were

11   relevant whether Plaintiffs "intend[] to set precedent for the banning" of all lead

12   ammunition as NSSF alleges, NSSF Mot. at 10, an interest in avoiding unfavorable legal

13   precedent cannot be the sole basis for intervention as of right. *See, e.g.*, *Greene v. United*

14   *States*, 996 F.2d 973, 977 (9th Cir. 1993) (finding that the proposed intervenors' "interest

15   in preserving the favorable effects of *stare decisis* [was] too speculative to warrant

16   intervention"); *Ne. Cal. River Watch v. Fluor Corp.*, 2014 WL 3385287 (N.D. Cal. July

17   9, 2014) (finding speculative *stare decisis* effects insufficient for intervention, even when

18   proposed intervenor had a past ownership interest in land subject to a RCRA action for

19   lead contamination). Allowing Plaintiffs' general political perspectives and goals to

20   influence the outcome of an intervention motion in a specific case would extend

21   intervention as of right to an unprecedented number of potential interveners in all manner

22   of cases. This Court should reject NSSF's invitation to adopt such an interpretation.

23

24

1

2.    **NSSF Does Not Have a "Significantly Protectable" Interest in this Action**

2

3          As described above, NSSF contorts the allegations in Plaintiffs' Complaint and

4 exaggerates the effects of the potential relief in this case in order to manufacture

5 sufficient interests for intervention. When those contortions and exaggerations are

6 stripped away, the tenuous nature of NSSF's articulated interests becomes apparent. In

7 fact, at no point does the NSSF "identify the law that protects [its] interests nor do[es it]

8 demonstrate how [its] … interests are protectable in relation to" Plaintiffs' challenges.

9 *Idaho Rivers United v. Nez-Perce Clearwater Forest Supervisor Cheryl F. Probert*, No.

10 3:16-cv-00102-CWD (D. Idaho Apr. 19, 2016) (finding timber sale purchasers failed to

11 identify a protectable interest in relation to whether federal defendants fulfilled their

12 statutory duties in approving the timber sale) (citing *Nw. Forest Res. Council v.*

13 *Glickman*, 82 F.3d 825, 837 (9th Cir. 1996), *as amended on denial of reh'g* (May 30,

14 1996)). Instead, NSSF relies on the principle that "[w]hen a third-party challenges an

15 agency's final action or other regulatory policy, the members of the regulated industry

16 that are directly affected by that government action have a significant, protectable interest

17 that supports intervention." NSSF Mot. at 8. However, there is no "regulated industry" in

18 this case. Lead ammunition manufacturers and retailers would not be directly affected, if

19 affected at all, by a ruling in Plaintiffs' favor.

20          The cases NSSF cites in support of its argument clarify the distinction between a

21 "regulated industry" and the relationship of lead ammunition manufacturers to this case.

22 For example, in *Fund for Animals v. Norton*, 322 F.3d 728 (D.C. Cir. 2003), the D.C.

23 Circuit allowed the Mongolian government to intervene where plaintiffs had sued the

24

7

1   U.S. Fish and Wildlife Service ("FWS") for failing to list argali sheep as an endangered

2   species under the Endangered Species Act and for issuing permits to hunters to import

3   killed argali to the United States. The panel concluded, "because the relevant 'property'

4   is Mongolia's sheep and the relevant 'transaction' is the FWS's decision to permit the

5   importation of those sheep from Mongolia," the Mongolian government had satisfied the

6   interest requirement for intervention. *Id.* at 735. In contrast, NSSF's business interests in

7   the lead ammunition industry do not relate to the property (the KNF) or transaction of

8   this case (the Forest Service's failure to abate a known endangerment on its property).

9   Accordingly, *Fund for Animals* is easily distinguishable and, in fact, supports a finding of

10  no significant interest under the facts of this case.[4]

11        NSSF articulates a second interest in the "economic vitality and legal rights of its

12  members, which include the leading domestic manufacturers of [lead ammunition]."

13  NSSF Mot. at 9. This generalized interest is also inadequate to support intervention. *See*

14  *Trident Seafoods v. Bryson*, 2012 WL 1884657, at *3–4 (W.D. Wash. May 23, 2012)

15  (finding proposed interveners' interests insufficient at merits stage when based on

16  [4] The other cases cited by NSSF are similarly distinguishable. *See NRDC v. EPA*, 99
    F.R.D. 607, 609 (D.D.C. 1983) (allowing pesticide manufacturers and industry
17  representatives to intervene in a suit challenging procedures pursuant to which EPA
    reached preliminary decisions that the pesticide products of the *potential intervenors*
18  merited continued registration); *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C.
    Cir. 1998) (holding that the Chemical Manufacturers Association had standing to
19  intervene to challenge the Military Munitions Rule because some of its members
    produced military munitions and operated military firing ranges *regulated under that*
20  *rule*); *Conservation Law Found. of New England v. Mosbacher*, 966 F.2d 39, 41–44 (1st
    Cir. 1992) (holding that commercial fishermen had an interest in an action to require the
21  Secretary of Commerce to adopt a schedule for developing amendments and submitting
    proposed regulations to eliminate overfishing because the fishing groups *were the subject*
22  *of the regulatory plan and their business would be affected immediately and in the*
    *future*). In all these cases, regulation of the intervenors was dependent on the outcome of
23  the litigation—here, NSSF faces no additional regulation in relation to this case.

24

1    maintaining market share). To support its assertion of this interest, NSSF relies on an

2    exaggerated and attenuated chain of causation. First, NSSF's assertion assumes that

3    Plaintiffs' imminent and substantial endangerment claim in the KNF will necessarily

4    result in the widespread regulation of lead ammunition as a hazardous waste under

5    RCRA which, as previously discussed, is unfounded. Second, it speculates that, as a

6    result, the entire domestic ammunition industry must significantly alter its manufacturing

7    processes at great cost. NSSF Mot. at 10–11. NSSF contends that the end result will be a

8    price increase of 190 percent for lead ammunition, thereby burdening NSSF members

9    including hunters, causing them to purchase less ammunition, resulting in a reduction in

10   collection of federal excise taxes on ammunition, in turn reducing wildlife conservation

11   funding provided by those taxes. Keane Dec, ¶¶ 9–12. This unsupported chain of dire

12   predictions is inadequate to support a significantly protectable interest "relating to the

13   property or transaction that is the subject matter of the action." Fed. R. Civ. P. 24(a)(2).

14   To the contrary, it weighs against intervention as of right, the determination of which is

15   "guided primarily by practical and equitable considerations."[5] *Donnelly*, 159 F.3d at 409;

16   *see also Am. Mar. Transp., Inc. v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989)

17   ("Thus, [proposed intervener's] interest is indirect, because no consequence to it flows

18   immediately from a Claims Court ruling, and contingent because of the uncertainty that

19   ───────────────

20   [5] In this regard, NSSF's purported interest in this litigation is even weaker than the
     National Rifle Association's ("NRA") purported interest, which at least showed that
     disposition of this action could potentially result in the inability of some of its members

21   who hunt in the KNF to use their preferred choice ammunition or firearms when hunting
     in the KNF. *See, e.g.*, NRA Mot. (Doc. 95) at 9. Plaintiffs maintain, however, that the

22   Court should find the NRA does not satisfy the requirements for intervention in this case
     or, alternatively, that the Court should only permit the NRA to file an amicus brief, or at
     most, to intervene in the remedy phase of the litigation.

23

24

9

other events will actually follow, causing [proposed intervener] to suffer any harm.").

**B.     NSSF Will Suffer No Impairment of Its Interests if the Action is Disposed of in Its Absence**

A potential intervener must demonstrate that the litigation "may as a practical matter impair or impede" its ability to protect its interests. Fed. R. Civ. P. 24(a)(2). Even assuming, *arguendo*, that NSSF has articulated a significantly protectable legal interest in this litigation, it has failed to show that its interests will be impaired or impeded as a result of this case despite NSSF's overblown efforts to do so.

Nowhere in NSSF's motion or supporting declaration does it assert that a finding of liability on the part of the Forest Service for substantial endangerment under RCRA would impair any interest that NSSF has *in the KNF. See generally* NSSF Mot.; Keane Dec. NSSF, in fact, explicitly acknowledges that Plaintiffs' claims are limited to the KNF, yet asserts an attenuated and speculative chain of causation that is required for the action to implicate NSSF's interests at all. NSSF Mot. at 4. NSSF suggests that "a finding by this Court that lead ammunition, lawfully discharged but not retrieved or recovered, violates RCRA will be far-reaching and extend to any land on which hunting . . . take[s] place, regardless of its ownership...." *Id.* This is simply wrong. A finding that the Forest Service is contributing to the disposal of solid waste on the KNF, which may present a substantial endangerment to the environment, would not "extend to any land on which hunting and related recreational activities take place." *Id.* Speculation about the precedential value of relief to Plaintiffs in this case to undefined areas or activities does not support a finding of impairment of NSSF's interests. *See Dilks*, 642 F.2d at 1157 (finding proposed intervener's potential liability for damages as a result of the action too

10

speculative to justify intervention). NSSF's claims that this case could set RCRA precedent adverse to its members are irrelevant to whether its purported interests in *this litigation* will be impaired. Moreover, even if adverse precedent could qualify as impairment of an interest, it would only harm NSSF where the disposal of spent lead ammunition may present an endangerment under RCRA. Given this critical statutory limitation on liability for lead disposal, which NSSF repeatedly fails to acknowledge in its motion, NSSF's claims of impairment ring hollow.

NSSF also asserts that a finding that the Forest Service is liable in this case will force lead ammunition manufacturers to "re-design their processes and facilities . . . [through] a complex process that would come only at great cost, if feasible at all" and lead to consumer price increases of 190 percent. NSSF Mot. at 10–11. NSSF offers no support for this figure, save a general statement in the Keane Declaration that it is based on unidentified research by NSSF. Keane Dec. ¶ 12. These figures are unfounded, extreme, and assume a nationwide ban on lead ammunition is somehow a likely consequence of an endangerment finding in the KNF.

Actual ammunition restrictions far more widespread than an endangerment finding in one national forest further call NSSF's assertions into question. For example, the federal government implemented a nationwide ban on the use of lead ammunition for waterfowl hunting starting in 1991. *See* 56 Fed. Reg. 22100–01 (May 13, 1991) (requiring non-toxic shot for all taking of waterfowl because "[t]he use of lead shot in waterfowl hunting poses unnecessary risk to certain migratory birds because when spent shot is consumed it often produces lead poisoning and death"). Given that the lead

11

1  ammunition industry has survived a 25-year nationwide ban on lead ammunition for an

2  entire category of hunting, NSSF's speculation that the abatement of the substantial

3  endangerment in the KNF will signal the end of the lead ammunition industry seems

4  greatly exaggerated.[6]

5       **C.    NSSF Has Failed to Show that the Forest Service Will Not Adequately Represent Any Interest It May Have**

6

7       An intervention applicant bears the burden of demonstrating that existing parties

8  will not adequately represent its interests. *Nw. Forest Res. Council v. Glickman*, 82 F.3d

9  825, 838 (9th Cir. 1996). A presumption of adequate representation exists when "an

10  applicant for intervention and an existing party have the same *ultimate* objective." *Id.*

11  (emphasis added). Furthermore, there is "an assumption of adequacy when the

12  government is acting on behalf of a constituency that it represents. In the absence of a

13  'very compelling showing to the contrary,' it will be presumed that a state adequately

14  represents its citizens when the applicant shares the same interest." *Lockyer*, 450 F.3d at

15  443. Because NSSF and the Forest Service share the same "ultimate" objective—a

16  finding that the disposal of spent lead ammunition in the KNF does not present a

17  substantial endangerment under RCRA—this Court should presume that the Forest

18  Service will adequately represent NSSF's interests. In light of this presumption, NSSF

19  must make a "compelling showing" to demonstrate inadequate representation. *Id.* It has

20  not done so.

21  [6] NSSF's own facts contradict its argument; the lead ammunition industry has continued to thrive and grow since the nationwide ban in 1991, including in the three years since

22  NSSF filed its first motion to intervene in this litigation. *Compare* 2013 Keane Dec. ¶ 6 (210,000 jobs; $32 billion economic impact), *with* 2016 Keane Dec. ¶ 7 (287,986 jobs;

23  $49 billion economic impact).

24

Moreover, NSSF does not identify a single argument it would make with respect to liability that the Forest Service will not make. NSSF's generalized assertion that the Forest Service "may not adequately represent all of the economic, recreation and legal interests of NSSF" does not amount to a "compelling showing" that the Forest Service is not "capable and willing" to make all of the arguments that NSSF would make. NSSF Mot. at 12. Further, NSSF fails to explain how its ultimate objective differs from that of the Forest Service. It states that it will suffer "injuries and damages" if the Forest Service "is directed to treat hunting with lead ammunition as the 'disposal' of a 'hazardous waste' under RCRA" but fails to identify those specific "injuries and damages." NSSF Mot. at 12. Additionally, the Forest Service will undoubtedly vigorously defend this articulated impairment of NSSF's interest. *See, e.g.*, Doc. 46 (Forest Service's 12(b)(6) Motion to Dismiss for Failure to State a Claim Under RCRA). If the Forest Service is successful in achieving its "ultimate" objective, NSSF's "ultimate" objective will also be achieved. NSSF attempts to create divergent interests by relying on nonbinding authority to state that the Forest Service cannot simultaneously protect the interest of the public and the private interests of NSSF. NSSF Mot. at 12 (citing *Nat'l Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977)). However, where those interests are pointed toward the same ultimate objective—as they are here at the liability stage—the presumption of adequate representation prevails. *See Lockyer*, 450 F.3d at 443.

Finally, NSSF does not bring any "necessary elements" to the litigation that would otherwise not be present. NSSF asserts that it will provide a "unique perspective" to the litigation, and that the Forest Service "simply does not have interests that are analogous

13

1    to the private interests of NSSF's members, nor does the Forest Service share their

2    business objectives." NSSF Mot. at 12. The only discernible basis for this assertion is that

3    the Forest Service is a federal agency "whose policies and litigation positions are

4    necessarily different from those of a private litigant." *Id.* at 13. With respect to liability

5    for the claim presented in this case, however, the litigation positions of NSSF and the

6    Forest Service are identical and NSSF has cited no case that uses a "unique perspective"

7    test to decide intervention motions, even if it did identify what additional arguments or

8    value that perspective would bring to this case. NSSF does state that its participation as a

9    party will assist the Court in understanding the manufacturing, distribution, sale, and use

10   of lead ammunition and the impact of Plaintiffs' relief on the industry. Keane Dec. ¶ 13.

11   But to the extent the Court would require or benefit from such information, as discussed

12   below, it would only be relevant at the remedy phase.[7]

13   **II.       Permissive Intervention is Unwarranted and Should be Denied**

14          This Court should also deny NSSF's request for permissive intervention because

15   NSSF's participation in the liability phase of the case will "unduly delay [and] prejudice

16   the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Courts deny

17   motions for permissive intervention on these grounds where the proposed intervenor's

18   arguments mirror the arguments of an existing party, and where an existing party will

19   adequately represent the proposed intervenor's interests, due to concerns that allowing

20   the intervenor to participate will complicate and delay the litigation. *See, e.g., WildEarth*

21   *Guardians v. Salazar,* 2009 WL 4270039, at *3 (D. Ariz. Nov. 25, 2009); *Puget*

22

     ---
     [7] Further, if NSSF has background information that could potentially assist the Court,
23   NSSF could provide that information in the form of an *amicus* brief.

                                                                                              14
24

1   *Soundkeeper Alliance v. EPA*, 2016 WL 1381840, at *4 (W.D. Wash. Apr. 6, 2016).

2   Moreover, in cases seeking to enforce environmental laws in the public interest, delays

3   due to intervention are especially prejudicial to parties and the public because they can

4   stall the resolution of important environmental issues. *See Alisal Water Corp.*, 370 F.3d

5   at 923 ("[I]ntervention could complicate and delay longstanding efforts by the United

6   States to ensure safe drinking water.").

7        Here, as discussed above, NSSF has not shown a significantly protectable interest

8   that will be impaired; nor has it shown that the Forest Service will inadequately represent

9   its interests. NSSF's intervention to pursue its other business-related objectives would

10  result in needless delay. *See Tripp v. Exec. Office of the President*, 194 F.R.D. 344, 348

11  (D.D.C. 2000) (denial of permissive intervention justified by same considerations as

12  denial of intervention as of right and because permissive intervention would

13  unreasonably frustrate the case). Further, counsel for NSSF indicated during the recent

14  hearing that it intends to propound discovery requests on Plaintiffs. Such requests will

15  likely be unnecessary or duplicative of requests from the Forest Service, and will only

16  serve to further delay and complicate this litigation. Thus, this Court should deny NSSF's

17  motion for permissive intervention because it will unduly delay and complicate this

18  litigation and prejudice Plaintiffs and the public.

19  **III.    NSSF Should Be Allowed to Intervene, if at All, Only in the Remedy Phase of the Litigation**

20

21       NSSF's purported interests in this litigation (*see* NSSF Mot. at 8–9) are

22  implicated, if at all, only during the remedy phase of the litigation. NSSF does not and

23  cannot claim to have a significantly protectable interest in solid waste disposal on the

24

15

1  KNF or in the Forest Service's land management practices there. *See* Fed. R. Civ. P.

2  24(a)(2) (requiring interest "relating to the *property or transaction* that is the subject of

3  the action") (emphasis added). To the extent that NSSF's members will suffer the

4  exaggerated harms to ammunition manufacturing that NSSF fears, NSSF can adequately

5  represent that interest in the remedy phase of the litigation. For example, NSSF may

6  present evidence supporting its assertion that Plaintiffs' requested relief "would create

7  uncertainty in the marketplace" or cause effects that would "cascade through the supply

8  chain." NSSF Mot. at 11. Plaintiffs would be prepared to rebut these exaggerated claims,

9  but in any case they are questions of remedy, not liability.

10        NSSF acknowledges that these interests are implicated at the remedy phase,

11  stating that the Forest Service "is not in [a] position to defend *against the relief sought* by

12  Plaintiffs." NSSF Mot. at 12 (emphasis added). NSSF, however, has no interest in

13  determining whether the Forest Service has contributed to waste disposal that may

14  present a substantial endangerment on the KNF; if it has any interest at all, it is in how

15  the problem of exposure to spent lead ammunition is addressed at the remedy stage.

16        The Western District of Washington addressed a similar scenario in *Trident*

17  *Seafoods*, 2012 WL 1884657, at *4. In that case, catchers and catcher vessels of rockfish

18  sought to intervene in an action against the federal government regarding the

19  management and regulation of rockfish fisheries. *Id.* at *1. The proposed intervenors

20  sought to protect their market share of rockfish. *Id.* at *1–2. Because their business

21  interest was "unrelated to [Plaintiffs'] legal claim," the court allowed them to intervene

22  but limited their participation to the remedy phase. *Id.* at *3–4. It reasoned that, since the

23

24

16

1  membership organizations' interests "l[ay] in maintaining their market share and their

2  market share is only at stake if Plaintiffs prevail on the legal claims, . . . [they] lack[ed] a

3  significantly protectable interest at the merit stage." *Id.* at \*3. *See also Donnelly*, 159

4  F.3d at 409–10 (examining appropriateness of intervention separately for liability and

5  remedial phases of case). Although NSSF's articulated interests are less direct than the

6  interveners in *Trident*, any interest NSSF may have in maintaining the status quo

7  regarding the use of lead ammunition in the KNF would only be implicated if Plaintiffs

8  prevail on liability.

9  **IV.    Conclusion**

10          For the foregoing reasons, Plaintiffs respectfully request that this Court deny

11  NSSF's Motion for Leave to Intervene. If the Court grants NSSF's Motion, Plaintiffs

12  respectfully request that the Court limit NSSF's participation to the remedy phase of this

13  litigation. Finally, if the Court grants intervention for both NSSF and NRA/SCI at any

14  phase of the litigation, Plaintiffs respectfully request that the Court order the intervenors

15  to file joint briefs. *See Trident*, 2012 WL 1884657, at \*5 (ordering joint briefs when "the

16  Court observes that [proposed interveners] filed their motions to intervene within weeks

17  of each other and present similar arguments").

18                                    Respectfully submitted,

19  Dated:  April 20, 2016            */s/ Allison LaPlante*
                                       Allison LaPlante
20

21

22

23                                                                              17

24

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on April 20, 2016, I electronically transmitted the attached document

3

to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

4

Electronic Filing, which will send notification of such filing to the following:

5

**Dustin Maghamfar**, Attorney for Defendant United States Forest Service

6

**James Odenkirk**, Attorney for the State of Arizona

7

8

**Carl Dawson Michel**, **W. Lee Smith, Scott M. Franklin**, **Douglas S. Burdin**
**Anna M. Seidman**, Attorneys for Proposed Intervener National Rifle Association.
and Safari Club International.

9

10

**Norman D. James, Rhett A. Billingsly,** Attorneys for Proposed Intervener National
Shooting Sports Foundation.

11

12

**Kevin Cassidy**, Attorney for Plaintiffs.

13

14

*/s/ Allison LaPlante*
Allison LaPlante

15

16

17

18

19

20

21

22

23

24

18